**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-19-003 (RCL)** |
| **ROBERT TURNER,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Robert Turner to 51 months' imprisonment, a three-year term of supervised release, $2,000 restitution, and mandatory assessments of $100 per felony, $25 per Class A misdemeanor, and $10 per Class B misdemeanor.   The Government's custody recommendation for Turner of 51 months is at the top end of Turner's Guidelines Range (41 to 51 months' imprisonment as calculated by the Government).

**INTRODUCTION**

The defendant, Robert Turner, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

1

Turner joined a crowd of rioters that charged MPD officers on a sidewalk near the Lower West Terrace of the U.S. Capitol and pushed through the group of officers, though Turner did not push any officers there.   At the top of the Northwest stairs, Turner was one of the first rioters that crossed over barricades that were the last line of defense for officers protecting the Upper West Terrace and Capitol Building.   Turner entered into the U.S. Capitol Building through the Senate Wing Doors, less than a minute after that door was breached.   After exiting the Capitol Building, Turner remained on restricted Capitol grounds for more than an hour.     During that time, Turner returned to the Upper West Terrace where officers had formed a police line, and rushed the MPD officers, including assaulting Officer A.S. by attempting to tackle him and then by attempting to take the officer's baton.   After the riot, Turner posted videos and sent messages about the January 6 riot and his assault of officers, showing a lack of remorse for his actions.

The Government recommends that the Court sentence Turner to 51 months of incarceration for his convictions of violating 18 U.S.C. §§ 111(a), 231, 1752(a)(1), 1752(a)(2), and 1752(a)(4), and 40 U.S.C. §§ 5104(e)(2)(D), (F) and (G).   A 51-month sentence reflects the gravity of Turner's conduct, and his lack of remorse for his actions.

---

Capitol Building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the Government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the Government has sought restitution based on a case-by-case evaluation.

I.    **FACTUAL BACKGROUND**

A.    **The January 6, 2021 Attack on the Capitol**

The Government refers the court to the Affidavit accompanying the Complaint filed in this case, ECF No. 1 ("Statement of Facts"), pp. 2-3, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.    **Robert Turner's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Turner, a 42-year-old facilities manager at a cannabis farm, participated in the January 6 attack on the Capitol. Turner and his nephews, Gregory Purdy and Matthew Purdy (collectively, "the Defendants"), traveled from New York, to Washington, D.C., to protest the results of the 2020 presidential election.   On January 6, 2021, the Defendants attended the "Stop the Steal" rally, then joined the crowds that approached the U.S. Capitol on Pennsylvania Avenue.

*Surrounding Officers on Sidewalk Near Lower West Plaza*

At 2:01 p.m., Turner was part of a group of protestors that stood opposite a group of MPD officers who were dressed in hard gear.   The MPD officers had reported to the U.S. Capitol in response to a city wide "1033," which is a call indicating that officers need assistance.   In this case, U.S. Capitol Police needed assistance to protect the Capitol, members of Congress, and their staff.   The group of MPD officers were on a sidewalk on the West side of the Capitol, moving towards the Lower West Plaza.   The officers had to stop their progress because they were surrounded on all sides by rioters, including the Defendants.   Turner was wearing a dark bluejacket, a blue "Trump" stocking hat and had a blue "Trump" flag draped over his shoulders.

3

He reached towards the officers but did not have physical contact with the officers.    *See* Image 1.



*Image 1, Turner (circled in red) and Gregory Purdy (circled in green) with other rioters surrounding officers on sidewalk near the Lower West Plaza (source: Trial Ex. 601.3, clip from Officer A.G.'s body-worn camera, video time 00:59)*

Shortly after this, the crowd charged the officers.   Gregory Purdy pushed through the officers and went to the Northwest staircase, which connected the Lower West Plaza to the Upper West Terrace.   Turner did not push the officers but was near the other rioters that struggled with the officers.   Turner pointed to Gregory Purdy on the Northwest staircase.   *See* Image 2; *see also* Trial Ex. 503.1, "@nigrotime 2021".



*Image 2, Turner (circled in red) along with Matthew Purdy (circled in yellow) surrounding MPD officers on sidewalk near the Lower West Plaza (source: Trial Ex. 503.1, Clip from open-source video Nigrotime 2021, at video time 02:21).*

### Crossing Over Barricade on Northwest Staircase

Turner next went to the Northwest staircase.   On the stairs, was scaffolding set up for the ongoing construction of the stage to be used at the then-upcoming inaugural ceremonies. U.S. Capitol Police had put barricades on the base of the staircase to prevent the public from entering the west side of the Capitol, the scaffolding, and the Upper West Terrace of the Capitol. However, the crowd overwhelmed officers and passed these barricades to go onto the Northwest staircase and under the scaffolding.

Turner passed rioters and climbed onto the staircase banister, part of the way up the Northwest staircase.   While there, Turner filmed the rioters on the staircase, inside the scaffolding and on the Capitol Grounds.   *See* Images 3, 4.   Turner stated to other rioters "This is all ours. This is our country." Trial Ex. 420.1, video time 00:01 – 00:6.   Another rioter yelled, "Surround the Capitol." Trial Ex. 420.1, video time 00:07-00:09. After that, Turner yelled to other rioters, "Come on.   Don't let them – don't let them think they're ever going to get away with it.   This is

bullshit. Ever, ever, ever!" Trial Ex. 420.1, video time 00:14 - 00:19.   Later, Turner posted that video to his Instagram account.

 

*Images 3 and 4, Video of rioters and Turner's statements on Northwest staircase*
*(source: Trial Ex. 420.1, video from Turner's Instagram account, video time 00:09 and 00:15)*

U.S. Capitol Police officers held a line near the middle of the Northwest staircase and scaffolding, but at 2:09 p.m. rioters, who were advancing up the stairs towards the Capitol Building,   pushed the line of officers back to the top of the staircase. The Defendants climbed through the scaffolding and up to the top of the staircase at approximately 2:10 p.m. to 2:11 p.m. *See* Image 5.



*Image 5, Turner (circled in red), Gregory Purdy (circled in green) and Matthew Purdy (circled in yellow) climbing to the top of the Northwest staircase (source: Trial Ex. 506.2 at video time 01:06, open-source video)*

After rioters forced officers to retreat to the top of the Northwest staircase, U.S. Capitol Police officers tried to reestablish the police line at the top of the stairs.   The officers set up a line of barricades and stood behind the barricades.   This line was the final physical barrier between the rioters and the Upper West Terrace and the Capitol Building.   Officers told the large group of rioters to "Stop."   Also, officers, including U.S. Capitol Police Officer B.T., initially held onto the barricades against the rioters, while the rioters pushed on the barricades, attempting to move past the officers.   Officer B.T. let go of the barricade when rioters began to push the barricades over.   Gregory Purdy and other rioters can be seen overwhelming the outnumbered police and pushing the barricades to the ground, successfully breaking through metal barricades.   Seconds later, Turner was one of the first group of rioters that crossed over the fallen barricades on to the Upper West Terrace.   *See* Image 6, and Trial Ex. 506.2 from video time 01:50 – 02:05.



*Image 6, Turner (circled in red), Matthew Purdy (circled in yellow) and Gregory Purdy (circled in green) when the barricades were pushed over on the Upper West Terrace towards officer B.T. (source: Trial Ex. 506.2, at video time 02:04, Open-source video)*

When the barricades were on the ground, it was harder for the officers to hold the line. The officers were overwhelmed and retreated.   Without that defense from the line of officers and barricades, the rioters had nothing between them and the Capitol Building.   Turner crossed over the fallen barricades onto the Upper West Terrace.   Turner was filming on his cell phone as he crossed on to the Upper West Terrace.

### Entering the U.S. Capitol Building

Turner crossed the Upper West Terrace and went to the North side of the Terrace.   He then turned around and came back towards the Senate Wing Doors of the U.S. Capitol Building.

At approximately 2:13:03 p.m., rioters from the outside of the Capitol broke the windows to the Senate Wing Doors of the U.S. Capitol Building and climbed through one of the broken windows. At 2:13:30 p.m., protesters kicked open the Senate Wing Door from the inside. As this

was an emergency door, an alarm was set off when the Senate Wing Door was breached. Rioters began to enter through the emergency door. Protestors broke open the second window and climbed inside through the second broken window.    At 2:13:51 p.m., approximately 21 seconds after the initial breach of the Senate Wing doors, Turner entered through the broken door.    *See* Image 7.



*Image 7, Turner (circled in red), Gregory Purdy (circled in green), and Matthew Purdy (circled in yellow) entered the U.S. Capitol through Senate Wing Doors at 2:13:51 p.m. (source: Trial Ex. 303.9 at video time 01:11. U.S. Capitol surveillance video, Senate Wing Doors)*

At about this time, because of the riot at the Capitol Building, the United States Senate was forced to stop their deliberations on the certification of the election results and to go into recess. Then-Vice President Mike Pence had to be evacuated from the Senate floor.    Then the House of Representatives also recessed and stopped it deliberations.    Congress did not reconvene until after 8:00 p.m. that evening.

Once inside the Capitol, Turner walked towards the Crypt, filming on his cell phone.    *See* Trial Ex. 303.10, video time 01:08 – 01:26.    Turner returned to the area by the Senate Wing Doors and continued to film rioters inside the Capitol Building on his cell phone.    *See* Image 8, and Trial

Ex. 303.10, video time 1:53 – 2:13. This open-source video captured the sounds of the mob breaking windows and yelling, and the alarms sounding when the door is breached.   Rioters continued to enter the Capitol Building through the Senate Wing Doors and windows.   Turner walked north, down Senate hallways on the first floor of the U.S. Capitol Building.



*Image 8, Turner walking through Senate hallways near the Senate Wing Door (source: portion of Trial Ex. 303.10 at video time 02:07, open-source video "BGOnTheScene")*

At approximately 2:16 p.m., Turner exited the Capitol Building through the Senate Carriage Door, which was an exit leading to the plaza on the East side of the Capitol.   He was inside the U.S. Capitol Building for approximately 3 minutes.

### *Assault on MPD Officer A.S. on Upper West Terrace*

Turner and Gregory Purdy remained in the restricted area around the U.S. Capitol for more than an hour.   At approximately 3:24 p.m., Turner stood directly opposite of a line of MPD officers and in front of a large group of rioters on the West side of the U.S. Capitol, along the Upper West Terrace. The MPD officers prevented the rioters from re-entering the Upper West Terrace.

At 3:26 p.m., Gregory Purdy said to MPD Officer C.K., "I'd have a lot of respect for you

guys if you guys stood down."    At 3:27 p.m., a rioter next to Gregory Purdy said, "I wanna see Pence. Where's Mike Pence?" and Gregory Purdy turned to the rioter and nodded in agreement. A few seconds later, Gregory Purdy said to the officers, "Are you guys going to let us in, or are we gonna have to push in?"    At 3:28 p.m. and other times, Gregory Purdy turned back to the crowd of rioters and waved other rioters to move forward towards the officers. At 3:29 p.m., Gregory Purdy told the crowd, "Hold your ground, guys, we got more people coming. . ."

At approximately 3:30 p.m., Gregory Purdy leaned down and talked with Turner.    Thirty seconds later, Gregory Purdy yelled to the crowd, "Guys, guys, we all gotta go at once…" With raised hands, Gregory Purdy then counted down from ten to one.    *See* Image 9, *see also* Trial Ex. 603.9, Officer C.K. body-worn camera footage, at video time 03:25 – 03:38; Trial Ex. 606:12, Officer A.S. body-worn camera footage, at video time 01:29 – 01:42.



*Image 9, Turner (circled in red) and Gregory Purdy (circled in green) looking to the crowd on Upper West Terrace as Gregory Purdy did a countdown.*
*(source: Trial Ex. 511.2, at video time 00:01, open-source video)*

Turner stood behind Gregory Purdy, further into the crowd. MPD Officer A.S. was also on the line between Officer C.K. and Officer S.M.    *See* Image 10.



*Image 10, Officer A.S. standing next to Officer S.M. on Upper West Terrace
(source: Trial Ex. 425, video on Turner's Instagram account, at video time 00:14)*

At the end of his countdown, Gregory Purdy turned, lowered his shoulder, raised his arms, and ran forward into MPD Officer C.K.   *See* Trial Ex. 603.9 at video time 03:35 – 03:39.

Immediately after Gregory Purdy rushed into officer C.K., Turner turned and rushed up the stairs after Gregory Purdy.   *See* Image 11, *see also* Trial Ex. 604.6, video time 00:22-00:26, Trial Ex. 606.12, video time 01:42 – 01:44.



*Image 11, Turner (in red box) running forward to push MPD Officer A.S.*
*(source: Trial Ex. 604.6, Clip from Officer S.M.'s body-worn camera, video time 00:24)*

At the top of the stairs, Turner ran into MPD Officer A.S., pushed and wrestled with the

officer.   Turner's push forced Officer A.S. back off the police line. *See* Image 12, *see also* Trial

Ex. 604.6, video time 00:26 - 00:30.



*Image 12, Turner (circled in red) pushing Officer A.S. back off the police line
(source Trial Ex. 604.6, clip from Officer S.M.'s body-worn camera, video times 00:30)*

Turner then grabbed Officer A.S.'s baton and wrestled with Officer A.S. for several seconds. *See* Images 13, 14; *see also* Trial Ex. 606.12, at video time 01:44 – 01:53; Trial Ex. 604.6 at video time 00:28.   After about twenty seconds, officers were finally able to push Turner back into the crowd of rioters. See Trial Ex. 606.12, video time 01:56 - 01:58.





*Images 13 and 14, Turner grabbing Officer A.S.'s baton and pushing Officer A.S.*
*(source Trial Ex. 606.12, clip from Officer A.S.'s body-worn camera, video times 01:44, 01:48)*

### *Defendant's Social Media posts*

After the riot, Turner and Gregory Purdy were recorded after leaving the Capitol in the back of a vehicle.   In these videos, Turner made a number of statements about the January 6 attack on the Capitol.

Turner and Gregory Purdy talked specifically about the countdown and attack on officers on the Upper West Terrace. In recounting the events, Turner said: "let's do it, countdown, ten, nine, eight…When you hit one, I turned around and bum rushed them.   I knew you were bum rushing them too."   Trial Ex. 426.1.

In a second video, Turner and Gregory Purdy continued the discussion of the Upper West Terrace.   Turner said "Gonna have everybody bumrushing…".   Gregory Purdy said "we did, we had a lot of people and then they pushed you guys back."   Turner responded "I felt like we didn't have a lot of people…I felt like we didn't because I felt like I was getting a good push, and then it just …".   Trial Ex. 430.1.

In a third video, Turner and Gregory Purdy talked about possible future violence against the Government.   Gregory Purdy stated ". . . limited level of force, but given those circumstances, it's our job to uphold the Constitution and do a fucking rebellion." Turner then replied, "I call for a revolution, yes." *See* Trial Ex. 428.1.

Gregory Purdy posted the above-discussed videos to his Instagram account.

The day after the riot, Turner exchanged direct messages with other individual about the events of January 6, noting that "It was insane brother … Never experienced anything like it" and boasting "I was in the capital building!!".   Trial Ex. 438.1.

Turner has not shown remorse for his actions on January 6.   Since his trial, Turner made

16

statements from the D.C. Jail that demonstrated his lack of remorse for his actions.[2]

Officer A.S., the assault victim in this case, did not testify at trial and has not provided any statement of injuries.   However, the evidence at trial was clear that defendant Turner pushed and wrestled with Officer A.S.   Turner pushed the officer from his position on a police line, which meant other officers had to step up and cover the line.   Turner wrestled with the officer and grabbed his baton.   Further, Turner's participation in this riot aided those rioters who did succeed in injuring officers and destroying property.   His violent conduct served to incite and embolden other violent rioters around him.

## II.    THE CHARGES AND JURY VERDICT

On May 1, 2024, a federal grand jury returned a Superseding Indictment charging Robert Turner with nine counts: Obstructing Officers During Civil Disorder in violation of 18 U.SC. § 231(a)(3) and 2 (Count Four); Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Count Six); Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512 and 2 (Count Seven); Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Eight); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Nine); Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4) (Count Ten); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Eleven); Act of Physical Violence in the Capitol Grounds or

---

[2]  Turner calls from the D.C. Jail, including https://rumble.com/v5nzsbn-4ashli-j6-dc-vigil.html at video time starting at 1:23:39; https://www.youtube.com/watch?v=y1H55KSsgew, at video time 09:03-11:12; https://www.youtube.com/watch?v=MmAjbCLiPFg, at video time 1:26:30  -  1:38:22; and https://www.youtube.com/watch?v=Q6cHpJ7M784 at video time 1:54:30 – 1:56:30.

Buildings in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Twelve); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Thirteen). ECF No. 143.

On June 11, 2024, Turner was convicted of all nine counts (three felony counts and six misdemeanor counts) following a jury trial.   ECF No. 206.   However, on September 4, 2024, the Government moved to dismiss the count charging Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512 and 2 (Count Seven) in light of the *Fischer* decision by the U.S. Supreme Court.   ECF No. 225.

## III.    STATUTORY PENALTIES

Turner now faces sentencing on eight offenses of conviction.   He has been found guilty of Obstructing Officers During Civil Disorder in violation of 18 U.SC. § 231(a)(3) and 2 (Count Four); Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Count Six); Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Eight); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Nine); Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4) (Count Ten); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Eleven); Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Twelve); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Thirteen).

The Presentence Report issued by the U.S. Probation Office includes the maximum penalties that the defendant faces.   On Count Four, involving a violation of 18 U.S.C. § 231(a)(1),

the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than

three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.   On

Count Six, involving violations of 18 U.S.C. § 111(a)(1), the defendant faces up to 8 years of

imprisonment, a term of supervised release of not more than three years, a fine up to $250,000,

restitution, and a mandatory special assessment of $100.   On Counts Eight, Nine, and Ten,

involving violations of 18 U.S.C. § 1752, the defendant faces up to 1 year of imprisonment, a term

of supervised release of not more than one year, a fine up to $100,000, restitution, and a mandatory

special assessment of $25 on each count.   On Counts Eleven, Twelve, and Thirteen, involving

violations of 40 U.S.C. § 5104, the defendant faces up to 6 months of imprisonment, no term of

supervised release, a fine up to $5,000, and a mandatory special assessment of $10 on each count.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007).

The revised Presentence Investigation Report ("PSR", ECF No. 252) includes an error

because it does not include a Guidelines analysis for each Count—specifically Counts Four, Nine,

and Ten—to which the defendant was found guilty by the jury. *See* PSR ¶¶ 58-69, 76-81.[3] The

---

[3] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶¶ 54-57) that certain counts group—a conclusion with which the Government agrees— but does not set forth the Guidelines calculation separated for each count as required under

PSR correctly states that the U.S. Sentencing Guidelines do not apply to Counts 11, 12 and 13. *See* PSR ¶ 49. The Guidelines analysis for all counts is as follows:

<u>Count Four: 18 U.S.C. § 231(a)(3) and 2 (Turner and Gregory Purdy) (MPD Officers C.K. and A.S. on the Upper West Terrace between 3:30 p.m. and 3:32 p.m.)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | | +6 |
| | | **Total** | **20** |

<u>Count Six: 18 U.S.C. § 111(a)(1) (MPD Officer A.S.)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | | +6 |
| | | **Total** | **20** |

<u>Count Eight: 18 U.S.C. § 1752(a)(1)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| | | **Total** | **14** |

<u>Count Nine: 18 U.S.C. § 1752(a)(2)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| | | **Total** | **14** |

<u>Count Ten: 18 U.S.C. § 1752(a)(4) (Turner and Gregory Purdy) (MPD Officers C.K. and A.S. on the Upper West Terrace between 3:30 p.m. and 3:32 p.m.)</u>

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | | +6 |
| | | **Total** | **20** |

The PSR correctly includes a grouping of related offenses and the multiple count adjustment. *See* PSR §§ 50-63.   Specifically, there should be two groups:

- *Group 1 (Offense Level ("OL") 20)*: Count 4 (OL 20), Count 6 (OL 20), and Count 10 (OL

---

U.S.S.G. § 1B1.1(a)(4).

20)
    o Counts 4, 6, and 10 group.   Each count is dependent on Turner's assault of MPD Officer A.S., and thus, with regard to defendant Turner, have the same victim and should group pursuant to U.S.S.G. § 3D1.2(b).

*Group 2 (OL 14)*: Count 8 (OL 14) and Count 9 (OL 14)
    o Counts 8 and 9 group pursuant to U.S.S.G. § 3D1.2(b) because they have the same victim – Congress.

**Multiple Count Adjustment:**

| **Group/Count** | **Adjusted Offense Level** | **Units** |
|---|---|---|
| Count Group 1 | 20 | 1.0 |
| Count Group 2 | 14 | 0.5 |

Total Number of Units:                                          1.5

Per U.S.S.G. § 3D1.4, for 1.5 Units, increase the offense level by 1 level.

| **Combined Offense Level** | **21** |
|---|---|
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | <u>0</u> |
| **Total Adjusted Offense Level:** | **21** |

### *Section 4C1.1 Does Not Apply Because of Turner's Criminal History and His Use of Violence and the Credible Threats of Violence in Connection with His Crimes*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   Section 4C1.1 does not apply in this case because (1) Turner has two criminal history points and (2) his personal use of violence or credible threats of violence against people or property under a totality of the circumstances.

Turner has two criminal history points, as stated in the PSR §§ 74, 75.   Turner does not meet the requirements of U.S.S.G. §4C1.1(a)(1) due to his criminal history.   With a total criminal history score of two, Turner has a criminal history category of II.

21

On August 24, 2014, Turner was charged with Driving While Intoxicated, First Offense. This case was *People of the State of New York v. Robert J. Turner*, case number 14-1150, docket number CR-01090-14, in Peekskill City Court, New York.  On January 20, 2015, Turner was sentenced for this offense in Peekskill City Court, New York, on this charge to a six-month license revocation, conditional discharge of one year, a $500.00 fine, and $370.00 surcharge.  *See* PSR ¶ 74, and Sentencing Ex. A, court record from Peekskill City Court (redacted copy attached, unredacted copy filed under seal).  This offense results in one criminal history point pursuant to U.S.S.G. § 4A1.2, comment (n. 5).

Turner also has a prior conviction from 2016 for Reckless Endangerment – 2nd Degree in Lloyd Town Court, New York.  On April 28, 2016, Turner was charged with Operating a Motor Vehicle While Impaired 1st (Drugs), DWI-Previous Conviction, Speeding, Lane Violation, No Safety Glass, Reckless Driving, Reckless Endangerment 2nd Driving.  This case was *People of the State of New York v. Robert J. Turner*, case number 16040220, in Lloyd Town Court, New York.  On December 15, 2016, Turner pled guilty to the Reckless Endangerment in the Second Degree charge.  Turner was sentenced to 3 years' probation and a $205 surcharge. *See* PSR ¶ 75 and Sentencing Ex. B, court record from Lloyd Town Court, New York (redacted copy attached, unredacted copy filed under seal).  This offense results in one criminal history point pursuant to U.S.S.G. § 4A1.2, comment (n.5).

Turner has two additional convictions for alcohol-related driving offenses.  In the first case, on March 29, 2002, Turner was arrested for Driving While Ability Impaired by the Consumption of Alcohol. 1st Offense.  On September 23, 2002, he pled guilty in Courtlandt Town Court, New York.  He was given a conditional discharge, paid a $300 fine and his license was

suspended for 90 days.   PSR ¶ 72 and Sentencing Ex. B, p. 16 (redacted copy attached, unredacted copy filed under seal).   This offense results in no additional criminal history points pursuant to U.S.S.G. § 4A1.2(e)(3).

In the second case, on August 26, 2004, Turner was charged with Driving While Intoxicated – 1st Offense.   On November 3, 2005, he pled guilty to a charge of Reckless Driving in Wappingers Falls Village Court, New York, and was sentenced to a $300 fine.   PSR ¶ 73 and Sentencing Ex. B, page 16 (redacted copy attached, unredacted copy filed under seal).   This offense results in no additional criminal history points pursuant to U.S.S.G. § U.S.S.G. § 4A1.2(e)(3).

In the current case, it is clear that Turner's actions on January 6 committed acts of violence and he made credible threats of violence against the MPD and U.S. Capitol Police officers. Turner was convicted of violent crimes against police on January 6, including 18 U.S.C. §§ 111(a)(1), 231(a)(3), and 1752(a)(4), and 40 U.S.C. § 5104(e)(2)(F).   Turner used violence and credible threats of violence in connection with the offense.   Turner was part of a crowd of rioters that surrounded MPD Officers on a sidewalk near the Lower West Plaza.   Turner was one of the first rioters to cross a barricade on the top of the Northwest stairs, overwhelming the U.S. Capitol Police that were using the barricade as a last line of defense to the Upper West Terrace.   Later, Turner rushed into the line of MPD officers on the Upper West Terrace, assaulting MPD Officer A.S. – pushing and grabbing the baton of the officer.   Therefore, Turner does not meet the requirements of § 4C1.1, specifically subsection (a)(3), and Turner is not eligible for the decrease his offense level under § 4C1.1.[4]

---

[4] Judge McFadden recently issued an order directly addressing the amended Guideline Section

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the Government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the Government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[5]

The U.S. Probation Office calculated the defendant's criminal history as category II, which is supported by the attached records from Peekskill City Court, New York, and Lloyd Town Court, New York. PSR ¶ 76. Accordingly, based on the Government's calculation of the defendant's total adjusted offense level at 21, Turner's Guidelines imprisonment range is 41 to 51 months' imprisonment.

---

4C1.1 in a January 6 case. In *United States v. Bauer*, Judge McFadden defined "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm". He also defined it as the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting Judge McFadden's definition of violence from *Bauer*). Further, the credible threat of force was defined by Judge McFadden as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6. Turner's violent actions – including a direct assault against officers – meet those definitions, as detailed above.

[5] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The Government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

*Other Guidelines considerations*

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c).  Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government must contextualize the crime.   Moreover, the following information and argument make it clear that – while the government is not advocating for such variance or departure – the high end of the guidelines is not only reasonable, but fully balances the defendant's conduct and the circumstances in which he committed said conduct. One cannot divorce the gravity of the overall threat to democracy from the defendant's assaultive behavior.

Indeed, as it stands now, nothing in this defendant's guidelines calculation reflects the fact that the defendant was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next.   There are no specific offense characteristics here for attacking democracy or abandoning the rule of law.   Thus, a sentence at the high end of the defendant's range properly ""reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power.   "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent.

Tr., at 67.   But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded.   Future generations will rightly ask what this generation did to prevent another such attack from occurring.   The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g., United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context.   For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment.   Sentencing Ex. C, *United States v. Michael Sparks*, 1:21-cr-87-TJK, Sentencing Tr., at 101.   In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function." Sentencing Ex. C, Sentencing Tr., at 94-95.   And not any proceeding, but one

foundational to our country's governance." *Id*. at 93.   The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id*. at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power).   While the Supreme Court's decision in Fischer has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up).   Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this

27

[sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.").

To be clear, the fact that the government is not seeking a variance or departure does not diminish the gravity of our request and the need to appropriately account for the conduct and the crime.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Turner's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Turner was part of a large crowd that surrounded officers near the Lower West Plaza.   Turner was one of the first rioters to overwhelm officers at the top of the Northwest staircase, and to cross onto the Upper West Terrace.   Turner was one of the first rioters that entered the U.S. Capitol through the Senate Wing Doors, less than a minute after that emergency door was breached by rioters.   Turner joined Gregory Purdy in charging into officers on the Upper West Terrace.   Specifically, he ran directly into MPD Officer A.S. and grabbed the officer's baton.   His pushing Officer A.S. off of the police line left other officers to deal with the angry mob.   Finally, Turner posted a video of rioters on the Northwest staircase on his Instagram account, and he made statements supporting his assault on the officers that were posted by Gregory Purdy.   Turner has not expressed any remorse for his actions on January 6.   The nature and

circumstances of Turner's offenses were of the utmost seriousness, and fully support the Government's recommended sentence of 51 months' imprisonment.

**B.  The History and Characteristics of the Defendant**

Turner has a Criminal History Category of II.   His criminal history consists of convictions for Reckless Endangerment-2nd Degree in 2016 (records indicate he was initially charged with Driving While Intoxicated—Previous Conviction of Designated Offense Within 10 Years); Driving While Intoxicated-1st Offense conviction in 2014; Reckless Driving in 2005; and Driving While Ability Impaired by the Consumption of Alcohol in 2002.   PSR, ¶¶ 72-75.   Turner also has an arrest in 2017 for Criminal Trespass 3rd: Property Fenced in or Enclosed, in the Poughkeepsie Town Court, New York, for which the disposition was unknown, but covered by a related case.   PSR, ¶ 80.   The defendant is a facilities manager with a commercial farm in California, and in that role, he oversaw major construction jobs.   PSR, ¶ 107.   He received his GED. PSR, ¶ 104. He did not return the authorization / waiver forms to the Probation Office to confirm the defendant's financial information. PSR, ¶ 116.   Finally, the defendant is currently in custody, and the PSR indicates no current physical, mental, emotional, or substance abuse issues which would prevent the defendant from serving a term of incarceration.[6]

---

[6] ████████████████████████████████████████████████████████

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Turner's criminal conduct on January 6 was the epitome of disrespect for the law. As noted in a recent case in this district, Judge Jackson stated "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Turner's actions on January 6 show his willingness to commit violence against law enforcement.   *See* Section II *supra*. Second, the defendant has shown no remorse or contrition for

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

his acts, and his statements to Gregory Purdy (some which Gregory Purdy posted) and on social media downplay the seriousness of his actions. Turner admitted that he "bum rushed" the officers, and he felt he "got in a good push", but he felt that they did not have enough support from other rioters against the police. Trial Ex. 430.1. Furthermore, Turner justified his actions on January 6, saying it was right to call for a "revolution." *See* Trial Ex. 428.1.

Additionally, the defendant has some criminal history prior to January 6, 2021, ranging from 2002 to 2017, including prior convictions for Driving While Ability Impaired by the Consumption of Alcohol in 2002, Reckless Driving in 2004, Driving While Intoxicated in 2014, and Reckless Endangerment-2nd Degree in 2016. ECF No. 252, ¶¶ 72-75, 80. His criminal history records indicate that he has thus far received no serious sentences for his criminal conduct, and his behavior on January 6 suggests an escalation in his criminal behavior and failure to be sufficiently deterred by such mild sentences. Therefore, Turner's sentence must be sufficient to provide specific deterrence from committing future crimes (including future violent crimes), particularly in light of his complete lack of remorse about his actions and his long criminal history.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Oliveras*, 1:21-CR-738 (BAH), defendant Michael Oliveras was convicted by a jury of three felony counts, including Civil Disorder (18 U.S.C. § 231(a)(3)) and Assaulting, Resisting, or Impeding Certain Officers (18 U.S.C. § 111(a)(1)) and Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)), and four misdemeanor counts.   After the Supreme

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court's decision in *Fischer*, the Government voluntarily moved to dismiss the Section 1512(c)(2) conviction, similar to Turner's case here.    Additionally, similar to Turner, Oliveras started January 6 on the sidewalk near the Lower West Plaza, where he joined rioters swarming police officers and pushed officers (although Oliveras was part of a group push and not directly pushing officers at this time); Oliveras yelled threats and harassing statements at officers (such as "Fucking Oathbreakers!"); Oliveras also entered the Capitol Building through the Senate Wing Doors; he entered the Capitol Building twice (he first entered at 2:22 p.m. for approximately 16 minutes, and a second time at 2:50 p.m.); after leaving the Capitol Building, Oliveras also assaulted officers (he stood at the front of a line of rioters on the Upper Northwest courtyard, and at one point stepped forward and directly pushed into officers); and Oliveras showed a lack of remorse (saying to FBI agents, "I wouldn't change a thing, I'd do it again.").

Judge Howell took into consideration Oliveras intent to stop the certification of the 2020 presidential election and the unique nature of the January 6 riot (*see* Sentencing Ex. D, *United States v. Oliveras*, 21-cr-738 (BAH), Sentencing Tr. at pp. 46-50), and gave an upward departure pursuant to U.S.S.G. § 5K2.7 (and alternatively, varied) "as a result of the significant disruption of a governmental function caused by the defendant's criminal conduct" (*id*. at 97).    Judge Howell ultimately sentenced Oliveras to 60 months' imprisonment, with a calculated Guidelines range of 37-46 months' imprisonment. Also, Judge Howell specifically noted that Oliveras' conduct would have been "more egregious" had Oliveras "participate[d] in more direct violence against officers," as Turner did here.    *See* Sentencing Ex. C, *United States v. Oliveras*, 21-cr-738 (BAH), Sentencing Tr. at p. 96.    Accordingly, a sentence of 51 months imprisonment for Turner is appropriate here in light of his direct violence towards officers.

In *United States v. Fairlamb*, 1:21-CR-00120-RCL, Fairlamb pled guilty to a charge of Obstruction of an Official Proceeding pursuant to 18 U.S.C. 1512(c)(2) and Assaulting, Resisting or Impeding Officers under 18 U.S.C. § 111(a)(1).   Like Turner, Fairlamb entered the Capitol Building through the Senate Wing Doors less than a minute after breach and he stayed in the Capitol Building for a short period of time (around 10 minutes).   Fairlamb assaulted an officer on the Upper West Terrace by shoving the officer, stuck his finger in the officer's face, and punched the officer's face shield.   Turner also assaulted an officer on the Upper West Terrace by "bum-rushing" into the line of officers, pushing officer A.S. off of the police line, and wrestling with him over his baton.   Fairlamb acted with the intent to stop the certification of the 2020 presidential election and showed a lack of remorse on his social media postings after the riot.   Unlike Turner, Fairlamb plead guilty to the two offenses and avoided a trial; he was a criminal history category I; and Fairlamb was not convicted of a felony civil disorder charge or the multiple misdemeanor offenses.   This Court sentenced Fairlamb to 41 months imprisonment, which was at the bottom of his applicable guidelines range of 41 to 51 months. A sentence at the top of the guidelines range is warranted in this case because Turner has not expressed any remorse for his actions, he was convicted of the additional felony of civil disorder for his actions on the Upper West Terrace and disrupting a police line, he has prior criminal convictions resulting in a criminal history category II, and he did not plead guilty or accept responsibility for his actions but went to trial.

In *United States v. Clayton*, 1:22-CR-139 (RCL), defendant pleaded guilty pursuant to an agreement to two counts of violations of 18 U.S.C. § 111(a)(1).   The defendant taunted police on the Upper West Terrace. The defendant resisted police by grabbing one officer's shield and stealing another officer's baton. As the defendant retreated from the police line, he encountered

Officer J.M., who was isolated in the crowd. The defendant grabbed Officer J.M.'s police shield before slinking back into the crowd.    Later, when the defendant walked the police line flaunting the stolen police baton, and when police attempted to retrieve it, the defendant resisted by shoving Officer M.P. in the head and grabbing his face mask.    When interviewed by the FBI, Clayton lied about his role on January 6, claiming he did not riot or engage in violence, and claiming he found the police baton and attempted to return it.    This Court sentenced Clayton to 30 months imprisonment.    Turner also rushed into a line of officers, pushed officer A.S. off the police line and wrestled with the officer for his baton.    Turner did not express remorse for his actions. Instead, Turner was recorded with his co-defendant Gregory Purdy that he felt he was "getting a good push" against officers on the Upper West Terrace, but they didn't have enough other rioters "bumrushing" the police line. Trial Ex. 430.1.    A higher sentence is warranted for Turner because of his assault that disrupted a police line, his lack of remorse, his criminal history, and his additional convictions on the civil disorder felony and multiple misdemeanors.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Turner was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the Government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019)

(quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Turner to pay $2,000 in restitution for his convictions on Counts Four, Six, Eight, Nine, and Ten. This amount fairly reflects Turner's role

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

in the offense and the damages resulting from his conduct. Moreover, in felony cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    FINE

The defendant's convictions for violations of 18 U.S.C. §§ 111(a)(1) and 231(a)(3) (Counts 4 and 6) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). The defendant's convictions for violations of 18 U.S.C. § 1752(a)(1), (2) and (4) (Counts 8, 9, and 10) subject him to a maximum fine of $100,000.   The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D), (F) and (G) subject him to a maximum fine of $5,000.   *Id.*   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## VIII.  CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence on Robert Turner of 51 months' imprisonment, a three-year term of supervised release, $2,000 restitution of, and mandatory assessments of $100 per felony, $25 per Class A misdemeanor, and $10 per Class B misdemeanor.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Lynnett M. Wagner*
LYNNETT M. WAGNER
Nebraska Bar No. 21606
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Tel: (402) 661-3700
Email: lynnett.m.wagner@usdoj.gov

*/s/ Kyle M. McWaters*
KYLE M. MCWATERS
Assistant United States Attorney
DC Bar No. 241625
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C.20579
Phone: (202) 252-6983
Email: Kyle.McWaters@usdoj.gov